## ATLAS TRADING CO. *v.* UNITED STATES

**No. 7591.**—Invoice dated Tientsin, China, January 16, 1940.
Certified January 16, 1940.
Entered at Los Angeles, Calif., March 7, 1940.
Entry No. 7381.

(Decided May 18, 1948)

*Harper & Harper* (*George R. Tuttle* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster, Michael Stramiello, Jr.,* and *John J. Antus*, special attorneys), for the defendant.

EKWALL, Judge: This is an appeal from a finding of value made by the United States appraiser at the port of Los Angeles, Calif., upon an importation of wool hooked rugs from Tientsin, China. The invoice was certified on January 16, 1940. The sailing date is stated on the entry as February 16, 1940. The values stated in the invoice are United States dollars, with certain charges which are included therein, expressed in F. R. B. dollars. The rate of exchange is stated on said invoice to be "14." The unit values set forth in the invoice are as follows:

862½ sq. ft. @ US $.14 per sq. ft. F. O. B_____ US $120. 75
318 sq. ft. @ US $.26 per sq. ft. F. O. B_____ US  $82. 68

Entry was made at yuan $.90 for item 2700 and at yuan $1.72 for item 2720. Appraisement was made at 14 cents and 26 cents United States currency, respectively, less 10.46 per centum for nondutiable charges, which was stated to be based on export value. While the invoice stated the values in United States dollars, the nondutiable charges were set forth in F. R. B. Japanese dollars, which the record shows are Japanese Federal Reserve Bank dollars.

Plaintiff contends in the brief filed that a system of currency control in effect in Tientsin known as the "link" system was a governmental exaction equivalent to an export tax, in that it was imposed by the Government only when merchandise was exported and was not imposed on goods remaining in China.

In support of its claim plaintiff introduced the affidavit of John J. Waldron, dated August 12, 1940 (exhibit 1); and the testimony of the following: Rupert Sewelson, buyer and general merchandise manager of the plaintiff company; Jacob W. Silverman, owner of the plaintiff company; George R. Gulick, the United States appraiser who appraised the merchandise; John C. Townsend, deputy collector in charge of the liquidating division at the port of Los Angeles; and Abraham Gottfried, attorney at law, associated with the firm of Harper & Harper, attorneys for the plaintiff herein.

Export value, on the basis of which appraisement was made, is defined in section 402 (d) of the Tariff Act of 1930 as follows:

EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Plaintiff's exhibit 1, the affidavit of Mr. Waldron, discloses that he is personally familiar with the instant merchandise, having purchased it on behalf of the Atlas Trading Co. This affiant then sets forth the "first cost" of the merchandise on and immediately prior to January 16, 1940; that Tientsin is the principal market for rugs of this character; that they are offered for sale in the ordinary course of trade in an unpacked condition; and that such or similar merchandise is not manufactured or sold for home consumption in China but is specially manufactured for export to the United States, The prices set forth in this affidavit are the entered prices, viz, yuan $0.90 per square foot for item 2700 and yuan $1.72 for item 2720. The affidavit further states that due to the Government regulations governing currency control, exporters are obliged to arrange "link" transactions with importers and that this particular transaction was calculated and effected on said "link" basis.

It is noted that this affidavit relates to prices on and immediately prior to January 16, 1940, the date on which the merchandise left Tientsin, and not the date of exportation, i. e., February 16, 1940, on which date the rugs finally left China, according to the entry. It has been held consistently that the date on which the importing

vessel left the last port of the country of exportation determines the date of exportation. See *B. H. Dyas Corp.* v. *United States*, T. D. 43600, 56 Treas. Dec. 268, and *F. F. G. Harper Co.* v. *United States*, Abstract 13158, 58 Treas. Dec. 980.

The witness Sewelson testified that from 1937 to about 1940 he was associated with the plaintiff company chiefly as buyer and general merchandise manager; that in connection with his purchases of rugs from China he had made several trips to that country, particularly to Tientsin. He was unable to recall the exact dates, but stated that he usually sailed during the early part of the spring—February—and remained all through the summer; that he was there in 1939, 1940, and 1941. During the course of these visits, he became familiar with Chinese currency, and during 1939–1940 the Chinese yuan dollar and F. R. B. dollar were used as mediums of exchange.

The witness in answer to a question explained the practical working of the "link" system in Tientsin on the date of purchase of these rugs and also in the spring of 1940. He stated that he could buy the goods, paying American money and "own the merchandise" at the local market price, but in order to export the goods from Tientsin, the equivalent of the yuan dollar would have to be applied on goods imported, and the difference between the rate of exchange applicable to the yuan F. R. B. dollar and the "link" rate of exchange would be applied to the benefit of the importer in Tientsin bringing in goods from the United States, to reduce his cost of importation. This was so in spite of the fact that the Chinese manufacturer was paid the local market price. The witness admitted that he was not in Tientsin at the time the contract for this particular merchandise was placed. He had no copies of the orders. In answer to a question as to whether he knew at what price the instant merchandise was freely offered for sale in the ordinary course of trade in the usual wholesale quantities for exportation to the United States on February 16, 1940, he stated he did not remember.

This witness further stated that the first cost of this merchandise, actually paid to the manufacturer, was yuan $1,323.21. By "first cost" he explained he meant the first manufacturer's cost in yuan dollars, which was calculated on the "link" rate imposed at the time, which "link" rate varied. He admitted that his firm's buying agent, John J. Waldron, made the offer in this particular case to his firm of $0.14 and $0.26, respectively, in United States currency, but if he were in China the offer was received in the original yuan dollars. The goods were freely offered to all in Tientsin at the prevailing Chinese rate of exchange, but if it was desired to export them, the "link" system had to be resorted to before an export permit could be obtained.

Mr. Silverman, an attorney and the owner of the Atlas Trading Co., the plaintiff herein, stated that he was familiar with the merchandise before the court and also with the methods employed by the Atlas Trading Co. in paying for these goods; that he was in Tientsin in the latter part of 1940 for about 3 months in order to study the currency situation. From the information he received from financial institutions in Tientsin, exporters, importers, etc., and Mr. Waldron, the affiant whose affidavit was submitted as exhibit 1, he stated that the "link" system was in effect from about the 17th of July 1939, until the time that war was declared against Japan; it was the same system during 1939, 1940, and up to December 1941. He explained the practical working of the "link" system in Tientsin. He admitted that the "link" rate dropped upon complaints from importers, but this was not an official change in the rate, but an arrangement between the Chinese importers for whose benefit the "link" rate was devised, and who could no longer obtain imports at the high official "link" rate, which he stated was around 14 cents. It was the lower rate arranged for privately between the exporter and the Chinese importers that governed the price of the goods.

The Government at this point in the testimony offered certain documents, consisting of a telegram or cable in code, dated January 7, 1939, which the witness was unable to identify; a copy of a cable dated September 3, 1940; and a letter from the Atlas Trading Co. signed by an employee of that company, which were received in evidence as collective exhibit 3. We have examined the documents in question and find that they are of no probative value.

The witness, Silverman, further stated that no purchaser of these goods in Tientsin could get his goods out of the country without this manipulation of the currency.

The United States appraiser of this merchandise testified that he did not know the rate at which he converted the nondutiable charges included in his appraised value, but said he "must have arrived at some reasonable way or means of finding the value of the merchandise. I appraised at a certain unit value. * * * I took everything into consideration."

Counsel for the plaintiff offered and there was received in evidence as collective exhibit 6 for identification a letter from the American Consul General at Tientsin under date of January 24, 1941, to the plaintiff's attorneys in answer to an inquiry as to invoicing procedure and local trading methods at Tientsin with reference to wool hooked rugs. Decision on the admissibility of this document was reserved. In view of the objection timely made to its admissibility, I find that it is not one of the documents provided for in section 501 (a) of the Tariff Act of 1930, as amended by the Customs Administrative Act

of 1938, which broadens the rules of evidence as applied to documents in reappraisement proceedings. It is not an affidavit, a deposition, a price list or a catalog, nor is it a report or a deposition of a consul, or of a customs agent, collector, appraiser, or assistant appraiser, nor was the signature proven. I therefore find it inadmissible in this proceeding.

Plaintiff's counsel also offered a copy of a letter addressed to the plaintiff herein, care of its attorneys, duly certified as being a copy of a letter mailed to the Atlas Trading Co. This was marked "Exhibit 7 for Identification" and ruling thereon reserved. The Government objected to its reception on the ground that it refers to a ruling of the Bureau of Customs made March 29, 1941, and relates to a state of facts which was apparently in existence a year and three months after the date of exportation herein. A perusal of this document discloses that it has no bearing on the issue here involved. I therefore find it inadmissible.

A careful study of plaintiff's evidence discloses that it is lacking in the requisite proof to set aside the appraisal in that it does not prove that the appraisement was in error nor does it affirmatively show values other than those found by the appraiser.

In regard to the claim that "the expense, charge, or cost of the 'link rate' transaction" imposed by the Japanese Government which occupied Tientsin on the date of exportation was a "governmental exaction equivalent to an export tax and is therefore not a part of the export value," plaintiff has failed to offer or place in evidence the law or regulation involved. The evidence in this respect consists of testimony of laymen as to the practical effects or working of the regulation or law.

It is elementary that foreign laws and regulations must be proven in accordance with well-settled rules of evidence; that courts do not take judicial notice of either written or unwritten laws of a foreign country. (Corpus Juris Secundum, vol. 31, sec. 21, page 537.)

As to the claim that the appraisement is erroneous in that the appraiser converted the nondutiable charges at a rate of exchange of his own choosing, we find no foundation for this claim. The official papers before the appraiser at the time of appraisement contained information as to the number of F. R. B. yuan dollars and United States dollars involved in the transaction, including the notation on the consular invoice, "rate of exchange @ 14." Moreover, the importer's declared value of 1323.21 yuan dollars and the value in United States dollars, $203.43, appearing on the consular invoice, indicated to the appraiser the applicable rate. All of this information was supplied by the plaintiff or its agents. Therefore, it cannot be said that the appraiser used a rate of his own choosing. That the

appraiser is within the law in converting currency in order to arrive at the value of merchandise has been held in the case of *Klingerit, Inc.* v. *United States,* Reap. Dec. 6159, 14 Cust. Ct. 435.

The presumption of correctness attaching to the appraiser's finding of value not having been overcome, I find the value found by him, i. e., United States $0.14 per sq. ft. f. o. b., and United States $0.26 per sq. ft. f. o. b., respectively, less 10.46 per centum for nondutiable charges, which represent export value, to be correct.

Judgment will be rendered accordingly.