ATLAS TRADING CO. *v.* UNITED STATES

No. 7989.—
Entry No. 7381.

First Division, Appellate Term

(Decided April 25, 1951)

*Lawrence, Tuttle & Harper* (*Charles J. Evans* and *George R. Tuttle* of counsel) for the appellant.

*David N. Edelstein,* Assistant Attorney General (*Richard F. Weeks,* special attorney), for the appellee.

Before OLIVER, COLE, and MOLLISON, Judges; COLE, J., dissenting

MOLLISON, Judge: The merchandise covered by this application for review of the decision of the single judge sitting in reappraisement, 20 Cust. Ct. 450, Reap. Dec. 7591, consists of wool hooked rugs. The rugs were purchased in Tientsin, North China, on January 16, 1940, and were shipped from China by the S. S. *President Cleveland* which sailed from Shanghai, February 16, 1940, and arrived at the port of Los Angles on March 7, 1940.

The consular invoice was certified at Tientsin, January 16, 1940, and contains the following:

| | |
|---|---|
| 862½ sq. ft. @ US $.14 per sq. ft. F. O. B. | US $120.75 |
| 318 sq. ft. @ US $.26 per sq. ft. F. O. B. | US 82.68 |
| | US $203.43 |

The following charges which were included in the above values were expressed in yuan or Japanese F. R. B. dollars:

| | | |
|---|---|---|
| Wharfage dues | FRB | $2.12 |
| Buying commission | | 128.13 |
| Packing | | 60.00 |
| Cartage | | 4.00 |
| Consular fee (U. S. $2.50) | | 32.50 |
| | | $226.75 |

Freight was to be paid at destination and the buyer was to pay the insurance. The rate of exchange was stated on the invoice to be at "14." Entry of the rugs was made in yuan dollars in the following manner:

*Order No.*

| | | | |
|---|---|---|---|
| 2700 | 822 sq. ft. | yuan $0.90 per sq. ft. | yuan 739.80 |
| 2720 | 318 sq. ft. | yuan $1.72 per sq. ft. | yuan 546.96 |
| 2818 | 40½ sq. ft. | yuan $0.90 per sq. ft. | yuan 36.45 |

The so-called "first cost," the prices paid to the Chinese manufacturer, and unit values set forth in the invoice are represented by the statement immediately above. Appraisement was made on the basis of export value and was made at 14 cents and 26 cents United States currency per square foot, packed, less 10.46 per centum for nondutiable charges. The invoice stated the values of the rugs in United States dollars, but the nondutiable charges were set forth in yuan dollars, the local currency of North China, which circulated interchangeably on an equal basis with F. R. B. dollars which were Japanese Federal Reserve Bank dollars. The trial judge sustained the appraised value.

The plaintiff-appellant makes two claims: (1) That the appraisement was erroneous if not illegal, and (2) that at the time of the transaction involved herein there was in operation and effect in Tientsin, North China, a system of currency and export and import control known as the "link" system by means of which the exporter of the wool hooked rugs in question was obliged and required to pay an exaction by the Japanese Provisional Government (then in military and occupational control of North China and Tientsin) for the issuance of a permit to export the goods purchased from the Chinese manufacturer, and that this exaction, made by and under the direction and compulsion of a governmental authority, was an export tax, or in substance and effect and actual operation the equivalent of an export tax; and it is further contended by the importer that this exaction was not made on goods which remained in North China but only if the goods were exported so that, as plaintiff claims, the exaction was actually a tax upon the act of exportation.

The appraisement was made on the basis of export value and both parties here and in the trial court agree that export value is the proper basis for determination of the value of the merchandise involved. Plaintiff's exhibit 1, the affidavit of the buying agent of the importer, who actually purchased the rugs involved, established that such or similar goods were not freely offered or sold for home consumption in the principal market of Tientsin, but that said goods were specially manufactured for export to the United States, and, consequently, there was no foreign value for the goods. Appraiser Gulick testified that there was a foreign value but that the export value was considerably higher. So that it is beyond dispute that the value of the wool hooked rugs is to be determined on the basis of export value, as that value is defined in section 402 (d) of the Tariff Act of 1930

(19 U. S. C. § 1402 (d)), which is set forth in the margin for convenience.[1]

The trial court rejected the claim of the plaintiff that the appraisement was erroneous, if not illegal. Plaintiff urged two grounds in support of this claim—(1) that the appraisement was made in United States currency contrary to the express provisions of article 776 (b) of the Customs Regulations of 1937, in force and effect at the time of importation of the rugs here involved, and (2) that in his appraisement the appraiser erroneously and without authority of law or regulations converted certain nondutiable charges, which were expressed in yuan dollars, into United States currency.

The merchandise involved was imported after the effective date of the Customs Administrative Act of 1938 (52 Stat. 1077), section 16 (b) of which provided that section 501 of the Tariff Act of 1930 should be amended to read in part as follows:

> Every such appeal [for reappraisement] shall be transmitted with the entry and the accompanying papers by the collector to the United States Customs Court and shall be assigned to one of the judges, who shall in every case, notwithstanding that the original appraisement may for any reason be held invalid or void and that the merchandise or samples thereof be not available for examination, after affording the parties an opportunity to be heard on the merits, determine the value of the merchandise from the evidence in the entry record and that adduced at the hearing.

The foregoing provision was in force and effect at the time of the filing of the appeal for reappraisement herein, and it was substantially reenacted in the 1948 revision of the Judicial Code (28 U. S. C., 1948 rev.) as part of section 2631 thereof.

In this situation, even if the contentions of the plaintiff were to be upheld and the appraisement declared invalid or void, or even erroneous, it would still be necessary to review the evidence and determine the value of the merchandise. In view of the conclusion we have reached as to the value of the merchandise, i. e., that the invoiced and entered values are the correct values of the merchandise, from which it follows that the appraised values are erroneous, we deem it unnecessary to pass upon the character of the appraisement as erroneous or illegal for the reasons advanced by the plaintiff.

Plaintiff's second contention is that at the time of the transaction involved herein, there was in operation and effect in North China the

---

[1] SEC. 402. VALUE.

\* \* \* \* \* \* \*

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

"link" system by means of which the exporter of the goods in question was obliged and required by the Japanese Provisional Government to pay an exaction for the issuance of a permit to export the goods purchased from the Chinese manufacturer and that this exaction is the equivalent of an export tax. If the plaintiff's claim is correct that the exaction that it was compelled and obliged to pay was upon the act of exportation or for the privilege of exporting the goods and accrued only upon the exportation of the goods from North China, then such exaction would not be a part of the export value under the provisions of section 402 (d). *Sternfeld* v. *United States*, 12 Ct. Cust. Appls. 172, T. D. 40065; *United States* v. *Tadross & Co. et al.*, 14 id. 10, T. D. 41528. Of course, if the governmental exaction accrued at the time of the sale by the Chinese manufacturer and was a part of the freely offered price or part of the transaction of purchase with the Chinese manufacturer, then such exaction would be a part of the export value. See *United States* v. *Passavant*, 169 U. S. 16.

The evidence indicates that the "link" system of currency and export and import control operated in the Japanese-dominated area of North China in the period from July 1939 to December 1941, and that at the beginning of its operation, which includes the time of exportation of the rugs here involved, it was applied as follows: The buying agent of an American importer would go into the market at Tientsin where, for example, wool hooked rugs were sold, and arrange with a Chinese manufacturer for the purchase of the merchandise at a price in local currency, Chinese yuan dollars, which was the same as, or interchangeable with, F. R. B. (Japanese Federal Reserve Bank) dollars. If the buying agent did not wish to export the goods but merely wished to own them or use or sell them within the North China area which was under Japanese Provisional Government control, then all that he need do would be to pay the Chinese manufacturer in Chinese yuan dollars which he could acquire at a bank in Tientsin by converting American cable transfers or drafts or American dollar letters of credit into Chinese yuan dollars at the prevailing free or open market rate of exchange, which at and about the period involved was somewhere between 5 cents and a maximum of 8 cents American currency for one Chinese yuan dollar. If, however, the buying agent for the American importer wished to export the wool hooked rugs, as was done in this case, he had to start with the agreed price with the Chinese manufacturer expressed in Chinese yuan dollars and then "ascertain" or state this amount in United States dollars, which price, stated in Chinese yuan dollars, was the so-called "first cost" of the merchandise, which "first cost" was the amount to be paid to the Chinese manufacturer. According to the record, the Yokohama Specie Bank at Tientsin was a branch of the Japanese Federal Reserve Bank and the former banking institution had control of all trade, i. e., export and

import transactions, and issued all permits for the export of merchandise from North China and likewise had the exclusive right to make all currency conversions in connection with export and import transactions. The Yokohama Specie Bank, acting under Japanese Provisional Government authority, required that the amount to be paid the Chinese manufacturer be stated in United States dollars and that this amount in United States dollars be disclosed to it by production of the invoice for inspection.

Under the "link" system, goods could not be loaded on the ship for export unless a permit or certificate was produced showing that the permissive "link rate" and "link transaction" had been complied with.

After arranging the purchase of the goods from the Chinese manufacturer, the buying agent of the American importer, as in the instant case, was obliged and compelled, since he desired to export the goods and desired an export permit, to arrange a "link" with a Chinese importer in North China who was interested in acquiring United States dollars with which to pay for goods purchased by the latter from the United States. But the "link" transaction, which the buying agent was obliged and compelled by the Japanese Provisional Government to arrange with the Chinese importer of American goods, was required by said Japanese law or regulation to be made or consummated at the official established permissive link rate which was 13⅞ or 14 cents American currency for every Chinese yuan or Japanese F. R. B. dollar (both the Chinese yuan dollar and Japanese F. R. B. dollar circulated at parity or equal rate in North China). The permissive link rate remained stationary, and the United States dollars, i. e., the sums stated in the invoice in United States dollars, were converted into Chinese yuan or Japanese F. R. B. dollars at the above-stated permissive link rate of 13⅞ or 14.

The Chinese importer was a stranger to the transaction of the buying agent and the Chinese manufacturer of the wool hooked rugs, and there was no real connection or relation between the merchandise which the American buying agent was purchasing from the Chinese manufacturer and the merchandise which the Chinese importer was purchasing from the United States. The record establishes beyond question, and there is no dispute about the fact, that the wool hooked rugs in question were actually purchased from the Chinese manufacturer by the American buying agent at a freely offered price in Chinese yuan dollars in the ordinary course of trade for exportation to the United States at the prevailing free or open-market currency rate of exchange and that they were paid for by the American importer, the plaintiff herein, at a price in United States dollars converted at a higher or fictitious or arbitrary permissive "link" rate of exchange, i. e., 13⅞ or 14 cents United States currency for each Japanese F. R. B. or Chinese yuan dollar. The record establishes that in such transac-

tions the American buying agent deposited with the Yokohama Specie Bank at Tientsin, by means of cable transfer or through letter of credit, United States dollars in the amount indicated on the invoice, the amount of United States dollars stated on the invoice being an amount equivalent (at the permissive, fixed rate) to the Chinese yuan dollars which the Chinese manufacturer was to receive for the wool hooked rugs. It is established by the record (Tr. 30, 31) that in the transaction involving the rugs in question, the amount of purchase stated in the invoice in United States dollars was $203.43 and that of this sum, the Chinese manufacturer of the rugs received in Chinese yuan or F. R. B. dollars the equivalent of $105.85 in United States currency; that the Japanese Federal Reserve Bank or its agent or branch, the Yokohama Specie Bank at Tientsin, received $20.34, and the balance in Chinese yuan or F. R. B. dollars went to the Chinese importer in Tientsin bringing in goods from the United States and with whom the link transaction had been arranged.

There is testimony in the record to the effect that the Yokohama Specie Bank, in its handling of the "link" transaction and in its procedures for the issuance of the desired export permit, first deducted for itself or the Japanese Government or authorities 10 per centum of the amount stated in United States dollars in the invoice tendered to it, and then paid the Chinese manufacturer the amount due him in Chinese yuan or Japanese F. R. B. dollars and the balance to the Chinese importer of American goods in either of the above local currencies. The Chinese importer was allowed the privilege of purchasing from the bank, United States dollar currency with which he might pay for goods purchased by him from this country.

It was suggested that the "link" system was a kind of subsidy designed to benefit the Chinese importers and to aid them in their purchase of American goods by giving them a subsidy and by providing a source of United States dollar exchange. It is also clear from the record that the link system of currency and export and import control was likewise designed to secure United States dollar exchange for the Japanese Provisional Government through its instrumentality, the Yokohama Specie Bank at Tientsin.

It is, of course, at once apparent that the requirement of the Japanese authorities that the "first cost" to be paid to the Chinese manufacturer in Chinese yuan or Japanese F. R. B. dollars be converted into United States currency at the "permissive" rate of 13⅗ or 14 cents, U. S., for each yuan or F. R. B. dollar, while the latter currency circulated in the free market at from 5 to 8 cents, U. S., would result in an inordinately high price to the American importer for goods purchased in the area involved. There is evidence in the record that subsequent to the time of exportation here involved, various subterfuges grew up whereby the "first cost" was stated to

the Japanese authorities at a lower amount than actually was the case, and an arrangement entered into between the Chinese manufacturer and the Chinese importer that the latter turn over to the former a portion of the funds in local currency received from the Yokohama Specie Bank received as the Chinese importer's part of the transaction.

However, the evidence indicates that the method of operation hereinbefore set forth was the one which was applied to the exportation of the rugs here involved and represents the method of operation of the "link" system at the said time of exportation.

Plaintiff contends that the total export value of the rugs in question is 1,323.21 Chinese yuan dollars, i. e., the "first cost," plus packing in the amount of 60 yuan dollars, which was the entered value; that the exaction imposed by governmental authority is in substance an export tax and not a part of the export value, as defined in section 402 (d) of the Tariff Act of 1930. Counsel for the defendant-appellee contends (1) that the exaction does not have the nature or characteristics of a tax and that it was not imposed by a Government for revenue purposes and (2) that the exaction was a part of the export market value or price which must be paid by every American importer who imports wool hooked rugs from that area; that the exaction is included in the price to all purchasers in the ordinary course of trade for export to the United States.

Plaintiff contends that the excess amount of money required to be paid by or for it upon the exportation of the goods was an exaction, charge, or pecuniary burden imposed upon it by the Japanese Provisional Government of North China; that the exaction was represented by the difference resulting in converting the Chinese national currency, or yuan dollar, into United States currency at the free or open-market rate of exchange and the permissive link rate of exchange established by Japanese governmental authority and enforced by the Yokohama Specie Bank at Tientsin; that the difference occasioned by the application of the permissive link rate to its purchase of wool hooked rugs was a tax upon the act of exportation; and particularly it was an export tax, as claimed by plaintiff, because the exaction or difference or excess of money, resulting from the application of the permissive link rate of exchange, was not included in the price paid to the Chinese seller or manufacturer.

Plaintiff established by means of the affidavit of the buying agent, exhibit 1, that the "first cost" of the wool hooked rugs represents the price at which such merchandise was freely offered for sale to all purchasers in Tientsin, China, which was the principal market in China for such and similar rugs in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States; that said wool hooked rugs were offered for sale in the ordinary course of trade

in their condition as manufactured without having been packed or in any way prepared for shipment; that upon the purchase of the rugs, the affiant, John J. Waldron, the commissionaire, arranged for the packing, preparing, transportation, and documentation of said merchandise. Plaintiff proved also by exhibit 1 that the rugs were purchased at the invoice unit values of yuan $0.90, $1.72, and $0.90 per square foot, respectively, for plaintiff's orders No. 2700, 2720, and 2818; that the rugs were freely offered in the usual wholesale quantity of 1,000 square feet and upward; that the rugs were purchased in the ordinary course of trade; and that the rugs were offered for sale in the ordinary course of trade in local Chinese currency, yuan dollars, and were actually purchased in Chinese yuan dollars, in which currency they were offered for sale. These facts were further corroborated by the testimony of plaintiff's witnesses, Rupert Sewelson and Jacob W. Silverman, and the defendant has not contradicted any of the facts above. No testimonial evidence was offered by defendant.

Under such facts, we must conclude that the exaction, or excess over first cost of 1,323.21 Chinese yuan dollars paid to the Chinese manufacturer or seller, did not accrue at the time of the purchase of the wool hooked rugs in question from the Chinese manufacturer and was not a part of the price at which said wool hooked rugs were freely offered or sold in the principal market at Tientsin, China, in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States and was therefore not a part of the export value, as said value is defined in section 402 (d) of the Tariff Act of 1930 (19 U. S. C. § 1402 (d)). The proof in this case shows that the exaction or excess or difference in money paid by the American importer or its buying agent accrued after the rugs in question were sold; that the exaction imposed by Japanese governmental authority accrued only in the event that the American buying agent desired an export permit for shipment of the rugs out of North China; and under such circumstances, we must conclude that the exaction was not a part of export value, as that value is defined in section 402 (d).

It is argued by counsel for the defendant that this exaction or excess over actual cost paid to the Chinese seller of the rugs was not a tax because it does not have the nature of a tax and was not imposed for revenue purposes. However, taxes are not levied solely for revenue purposes; they may be imposed or levied to provide subsidies for some class of persons which some Government wishes to aid or benefit, and the manner of collection and distribution is for the particular Government to determine. We observe that insofar as the requirement that an export license or permit must be secured for the exportation of goods and that the goods exported must be paid for at an officially established currency rate of exchange is concerned, the link system is not substantially different from currency and export and import controls of many countries.

The trial judge concluded that because the plaintiff did not offer or place in evidence a copy of the law or regulation concerning the "link" system, and had offered merely the testimony of "laymen as to the practical effects or working of the regulation or law," the plaintiff had, as a consequence, failed to prove that the "expense, charge, or cost of the 'link rate' transaction imposed by the Japanese Government" was a "governmental exaction equivalent to an export tax and is therefore not a part of the export value." With this conclusion we cannot agree.

In any event, it appears that both the existence of the "link" system as a governmental requirement in North China and the elements of its operation are not actually here in controversy. There is in evidence as *defendant's* collective exhibit 4 a sworn statement of one of plaintiff's witnesses, Jacob W. Silverman, taken in the offices of the Customs Agency Service at Los Angeles, Calif., outlining in detail the facts respecting the existence and operation of the "link" system in North China, and we observe that counsel for the appellee (defendant below) before this division recited as facts upon which his argument was based the elements of the "link" system as herein outlined. At no point in the record is there any denial on the part of the defendant of the existence and method of operation of the link system, so that it cannot be said to be an issue in dispute. We hold that the record establishes the existence, the operation, the application of the link system to plaintiff's act of exporting the goods, and the effect of such application, i. e., the exaction of an excess of money over the "first cost" of the rugs for said privilege of exporting.

The trial judge apparently held that since plaintiff's exhibit 1 related to prices on and prior to January 16, 1940, the date when the goods were shipped from Tientsin, and not the date of exportation of the rugs, February 16, 1940, plaintiff had therefore failed to prove export value. Plaintiff has cited *United States* v. *New York Merchandise Co., Inc.,* 31 C. C. P. A. (Customs) 213, C. A. D. 274; *United States* v. *Reiner,* 35 C. C. P. A. (Customs) 50, C. A. D. 370, which hold that it is not necessary that a freely offered price be shown on the exact date of exportation of the goods. There is nothing in the record to indicate a fluctuating price or unstable price conditions; but, on the contrary, the stability of the price established by plaintiff's exhibit 1 is confirmed by the testimony of the witness Silverman (Tr. 57–59) and also by defendant's collective exhibit 3, dated April 5, 1940, which refers to hooked rugs, and the invoice unit prices or values of 26 and 14 cents mentioned therein coincide with unit prices in the instant case; and we may infer that the freely offered prices of January 16, 1940, had not changed up to April 5, 1940, and therefore were the same on February 16, 1940.

We hold that the excess of money paid by the importer over the "first cost" paid to the Chinese seller or manufacturer and the exaction made or imposed by Japanese governmental authority by means of the link rate foreign exchange system of export and import control is in substance an export tax and that the decision in this case is controlled by the principles of law laid down in *Sternfeld* v. *United States, supra,* and *United States* v. *Tadross & Co. et al., supra.*

Upon consideration of the entire record we find as facts:

(1) That the merchandise consists of wool hooked rugs exported from China on February 16, 1940.

(2) That at the time of exportation of the merchandise involved, wool hooked rugs such as or similar thereto were not freely offered for sale or sold for home consumption in the principal markets of the country of exportation.

(3) That at the time of exportation of the merchandise involved, the price at which wool hooked rugs such as or similar to those here involved were freely offered for sale to all purchasers in the principal markets of China, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, was 0.90 yuan dollar per square foot, plus packing as invoiced, for the merchandise designated as order numbers 2700 and 2818, and 1.72 yuan dollars per square foot, plus packing as invoiced, for the merchandise designated as order number 2720.

We conclude as matters of law:

(1) That the proper basis for the determination of value of the merchandise involved is export value, as defined in section 402 (d) of the Tariff Act of 1930.

(2) That such value is the entered value as to each item.

Judgment will therefore issue reversing the judgment of the court below.

## DISSENTING OPINION

COLE, Judge: A careful reading of the record and study of the able briefs and the oral argument presented in this case, make it easy for me to conclude that the export value as found by the appraiser should apply.

Feeling as I do that the judgment of the trial judge should be affirmed, I most respectfully dissent from the position taken by the majority.