(Reap. Dec. 8195)

BORDER BROKERAGE CO. *v.* UNITED STATES

Entry No. 2533–E.

(Decided January 23, 1953)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* and *Frank L. Lawrence* of counsel) for the plaintiff.

*Charles J. Wagner*, Acting Assistant Attorney General (*Dorothy C. Bennett, Chauncey E. Wilowski*, and *Samuel D. Spector*, special attorneys), for the defendant.

EKWALL, Judge:. This is an appeal for reappraisement of mixed feed oat screenings exported from Canada to the United States on May 27, 1948. This merchandise was invoiced at $69.35 per ton of 2,000 pounds, track, Portland, Oreg., including freight, United States customs duty, consular invoice fee, customs brokerage fee, and a so-called equalization fee of 22 cents per bushel of 34 pounds. It was entered at $44.70 per ton of 2,000 pounds, equivalent to the invoice price, less nondutiable charges and less the equalization fee of 22 cents per bushel of 34 pounds. An equalization fee of 14 cents per bushel of 34 pounds was added back under a certificate of pending reappraisement in conformity with section 503 (b) of the Tariff Act of 1930, making the total entered value $52.95 per ton. The merchandise was appraised as entered.

It was stipulated between the parties that the merchandise was entered and appraised on the basis of the export value, as defined in section 402 (d) of the Tariff Act of 1930, at $52.95 per ton; that if the court finds that the equalization fee is not a part of the export value, then the said value is $44.70 per ton; and that on the date of exportation herein the foreign value, as defined in section 402 (c) of said tariff act, was not higher than $44.70 per ton. It was further stipulated:

5) That Kerr, Gifford & Co. Inc. of Vancouver, British Columbia, the seller and shipper of this merchandise, paid an equalization fee of 22 cents per bushel of 34 pounds to the Export Permit Branch, Department of Trade and Commerce, Ottawa, Canada, to obtain a permit to export the mixed feed-oat screenings covered by this appeal and that on the date of exportation of this merchandise the equalization fee then being charged was 14 cents per bushel of 34 pounds.

6) That this merchandise was sold by Kerr, Gifford & Co. Inc. of Vancouver, British Columbia, to Kerr, Gifford & Co. Inc. of Portland, Oregon, at $69.35 per ton of 2000 pounds, CIF Portland, Oregon, and that this amount included the following costs:

| | |
|---|---:|
| 1 ton of 2000 pounds | $45. 50 |
| Freight, Vancouver, B. C., to Portland, Oregon, at 47 cents per 100 pounds | 9. 40 |
| Equalization fee of 22 cents per bushel of 34 pounds | 12. 94 |
| US consular-invoice fee ($2.50) and customs broker's fee ($5) | . 19 |
| US import duty of 2½ percent of $52.95 | 1. 32 |
| Total | $69. 35 |

During the course of the trial, the record in reappraisement No. 159442–A, *Henry D. Gee Co.* v. *United States*, 24 Cust. Ct. 508, Reap. Dec. 7772, was incorporated herein upon motion of the Government. That case involved a shipment of mixed feed oats (screenings) imported from Canada on February 13, 1946. The record was summarized by the court in its decision as follows (pp. 509–510):

\* \* \* The [equalization] fee was an amount per bushel collected by the Canadian Wheat Board, an agency of the Canadian Government, from those who wished to export grain. Such persons paid an amount per bushel of grain for a so-called "permit," which amount was fixed by the Canadian Wheat Board from day to day. Notice to those interested (at least, so far as the record discloses, in Vancouver, British Columbia) of the amount determined by the Board as the fee for any given day was obtained by posting the same at 11 a. m. each day on the bulletin board at the Merchants' Exchange in Vancouver.

The record shows that at the time of the exportation of the merchandise here involved there was a ceiling price of $31.35 per ton on oats of the type at bar when sold for home consumption in Canada, and presumably (although the record does not so state), farmers would have to sell at this price or lower in order to sell their oats at all.

The record also shows that at the time of exportation of the involved merchandise dealers in grain in Canada were permitted to sell screenings of the type here in issue for export at $35.43 per ton, the difference between the Canadian ceiling price of $31.35 and the export price of $35.43 obviously covering overhead and a profit to the dealer. In addition, the record shows that while a permit obtained by paying the equalization fee was required in order to export grain, such permits might be purchased in advance, even when the person who purchased them might not have had any grain on hand or on order. \* \* \*

The practice, so far as the record discloses, in the obtaining of permits was for the dealer to offer the grain at a price which included the equalization fee in force at the time of sale, from which it appears that it was the duty of the offerer to purchase the permit by the payment of the equalization fee. The mechanics of connecting a permit with the merchandise ultimately exported are not revealed by the record.

It was held that the precise nature, characteristics, and incidence of the fee were not well enough delineated by the record to enable the court to come to any sound conclusion as to the exact status of the fee from a valuation standpoint and that the plaintiff had failed to overcome the presumption of correctness attaching to the appraiser's valuation, which included the amount of the equalization fee in the export value.

In the instant case, the plaintiff introduced into evidence an affidavit of Henry B. Monk, solicitor of the Canadian Wheat Board, sworn to the 17th day of January 1952, together with a number of attachments consisting of copies of various Canadian statutes and regulations, hereinafter referred to (plaintiff's collective exhibit 1). The defendant produced a report of Martin G. Scott, supervising customs agent, dated December 22, 1944 (defendant's exhibit A) and a report of S. C. Townsend, customs agent, dated December 21, 1943, to which are attached various exhibits (defendant's collective exhibit B).

This evidence brings out the following facts in addition to or in clarification of the record in the incorporated case: The basic statute involved is the Canadian Wheat Board Act of 1935. That statute established the Canadian Wheat Board for the purpose of marketing in an orderly manner, in interprovincial and export trade, grain grown in Canada. Its powers include authority to buy, take delivery of, store, transfer, sell, ship or otherwise dispose of grain, and to take such action as is necessary or incidental to carrying on such operations.

During the war years and until 1947, the exportation and importation of Canadian grain was controlled by the Governor in Council, acting through the Canadian Wheat Board, under the authority of the War Measures Act of 1914 and the National Emergency Transitional Powers Act of 1945.

A later statute, the Export and Import Permits Act of 1947, as amended in 1948, provides, among other things, that no person may export or attempt to export any goods included in certain lists to be established by order of the Governor in Council except under the authority of and in accordance with a permit issued under the act. Such lists included grain and grain products. The act also provides that permits may be issued by the Minister of Trade and Commerce or his representative and that the Governor in Council may make regulations prescribing the conditions under which permits may be issued, including the requirement for the recovery from the applicant of a sum representing the pecuniary benefit enuring to him as a result of a subsidy or other advantage conferred by the regulation of domestic prices.

Pursuant to this authority, Export Permit Regulations were issued on May 14, 1947. They provided, among other things, that "All applications for export permits must be made by an individual or firm resident in Canada" and that "Export permits are valid for a specified time up to 6 months." As to grain and grain products, it was provided that since part of the cost price is defrayed by the Government either directly or indirectly by reason of a subsidy payment, an equalization fee, representing a refund of this sum, must be paid to the Canadian Wheat Board before an export permit would be granted.

The equalization fee was set daily by the Canadian Wheat Board in an amount equal to the difference between the price of the like American product in the United States market and the ceiling price of the Canadian product, deducting from the difference the exporter's transportation and other costs and a reasonable profit. The fees so collected were placed in special funds to be distributed to the growers on a prorata basis at the end of the crop year. By this method, the growers received an amount equal to the export price on such portion of their produce as had been sold for exportation.

From time to time, the Canadian Wheat Board issues orders known as Instructions to Trade, which, according to the affidavit of Henry B. Monk (plaintiff's collective exhibit 1), have the force and effect of law when within the scope of the instructions of the Governor in Council.

It appears from these instructions that during the period from 1943 to 1948, the exportation of mixed feed oats by private persons was allowed only after an export permit for a specified quantity had been granted by the Board upon payment of the equalization fee. At times, the shipment of oats by private persons was prohibited entirely or was permitted only under specified conditions, including method of shipment, quantity shipped, area of origin, country of destination, and the currency in which payment was made.

The general regulations applicable to the exportation of mixed feed oats provide that export permits must be obtained from the Canadian Wheat Board and that payment of the equalization fee must accompany the application for a permit. It is further provided that export permits may not be transferred between companies and that once an export permit is applied for, approved, and the equalization fee paid, it cannot be canceled and the Board will not refund the fee even though the applicant decides not to export the grain. The application for a permit must state the quantity to be exported, and the amount of the equalization fee is estimated at the current rate in effect at the time the application is received.

During 1948, prior to the shipment involved herein, the control of exportation of mixed feed oats varied. Such exportation had been prohibited on September 13, 1947, but on February 2, 1948, it was announced that permits would be granted for limited quantities to be shipped from specified points in Canada to Sweden or Greece. Later, Switzerland and Norway were added to the permitted points of destination. On February 18, 1948, it was provided that export permits would be granted for limited quantities from certain points in Canada to any destination, provided payment was made in United States funds. The applicant was required to show that the mixed feed oats involved were a product of cleaning and not a result of an admixture of grain and that he was the owner of the quantity which

he desired to export at the time he made the application. Subsequent to the date of the shipment of the within merchandise, exportation of mixed feed oats was again prohibited for a time.

The sole question in this case is whether or not the equalization fee is a part of the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, as follows:

(d) EXPORT VALUE.—The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

In *Sternfeld* v. *United States*, 12 Ct. Cust. Appls. 172, T. D. 40065, the principle was laid down that a tax upon exportation of merchandise is a part of export value if it is an element or part of the market value or price of the merchandise, but not if it accrues only in case the merchandise is exported and at the time when it is exported. In that case, it was stipulated that the addition made by the appraiser to the entered value equaled "the amount of an export tax assessed by the Government of China upon the merchandise in question when exported from China." It was held that the tax was not a part of the export value on the ground that the facts did not "warrant the conclusion that the purchaser could not secure the goods until he had paid the export tax; nor that the wholesale price included the tax; nor that the market value or the price of the merchandise at the time of exportation of the same to the United States included the export tax."

*United States* v. *Tadross & Co. et al.*, 14 Ct. Cust. Appls. 10, T. D. 41528, involved rugs exported from China and other rugs exported from Persia. The former were purchased in the Chinese market at a certain price per square foot including no expenses other than the price of the rug. Importers' agents paid the expenses incident to packing and shipping, commissions, and an export tax which was imposed only when such goods were exported and not on goods remaining in China. The Persian rugs were examined by Persian customs officers upon exportation and a penalty or duty was imposed upon such as were found to be aniline dyed. It was held that neither tax formed a part of export value. The court said (p. 12):

* * * It must be apparent, from a consideration of the record, that the price paid for the goods in question was the price at which such merchandise was freely offered for sale to all purchasers, in the principal markets of the countries from which the same was exported and in the usual wholesale quantities at the

time of exportation, and in the usual course of trade, for any purpose, either of home consumption or export, and that such price did not include the export or aniline tax. * * *

In *Atlas Trading Co.* v. *United States*, 26 Cust. Ct. 652, Reap. Dec. 7989, it appeared that wool hooked rugs were purchased in and exported from North China in the following manner: The merchandise was purchased from the Chinese manufacturer in the usual wholesale quantities in the ordinary course of trade at a price expressed in Chinese yuan dollars, the so-called "first cost" of the merchandise. The purchaser, in order to export the merchandise, was required to arrange a "link" with a Chinese importer of American goods and to deposit with the Yokohama Specie Bank in Tientsin an amount of United States dollars equivalent to the Chinese yuan dollars the Chinese manufacturer was to receive, converted at an official established permissive link rate which was higher than the free rate of exchange. The said bank first deducted 10 per centum for itself or the Japanese Government or authorities, then paid the Chinese manufacturer the amount due him in Chinese yuan dollars, and paid the balance to the Chinese importer of American goods. It was held that the excess over the "first cost" of the merchandise did not accrue at the time of purchase, was not a part of the price at which the merchandise was freely offered for sale in Tientsin, and was not a part of the export value.

In the recent case of *United States* v. *International Commercial Co., Inc., et al.*, 28 Cust. Ct. 629, Reap. Dec. 8112, certain charges which accrued upon exportation, including a levy of 20 per centum of the net f. o. b. selling price imposed by an Argentine governmental agency, were held to be nondutiable and not a part of the export value of the merchandise. Prices were ordinarily quoted to purchasers in the United States on an f. o. b. basis, including these charges, but the packers were willing to and sometimes did sell ex plant or on an f. a. s. basis, in which cases the purchasers made the arrangements for exportation of the merchandise and paid the charges.

In all of these cases it appeared that the merchandise was or could have been purchased at a price which did not include the export tax or charge. Upon exportation, it was possible for the tax to be paid by the purchaser or shipper of the merchandise. In the instant case, a different situation prevails. The merchandise could be exported only with the approval of the Canadian Wheat Board and upon payment of the equalization fee. At the period involved herein, application for an export permit could be made only by an individual or firm resident in Canada who was then the owner of the merchandise. Therefore, a foreign purchaser, not a resident of Canada, could not obtain a permit and pay the fee himself. The permit had to be secured by the Canadian owner prior to the sale of the goods for

·exportation and the equalization fee was paid at the time of application for the permit. Moreover, the Canadian Wheat-Board was granting permits for the exportation of a limited amount of merchandise. As a practical matter, therefore, purchases for export would be made only after an export permit had been obtained or subject to obtaining the same. Otherwise, the purchaser might find that he had bought goods for export but was not permitted to send them out of the country. There is no evidence in the record that this merchandise was ever offered for sale at a price which did not include the equalization fee or that purchaser ever attempted to obtain an export permit and pay the fee himself.

Another consideration is the fact that the amount of the equalization fee was determined as of the date the application was made and not as of the date of exportation. In the instant case, for example, at the time application for export was made and the fee paid, it was fixed at 22 cents per bushel, while at the time of exportation it was fixed at 14 cents per bushel. It is, therefore, not a tax which accrued on the date of exportation of the merchandise but a fee payable in advance and included in the offered price of the goods. The seller first obtained the permit and paid the fee and then offered the merchandise at a price which included the amount of the fee he had already paid. He did not offer the merchandise at a certain price plus whatever the equalization fee might be on the date of exportation. Moreover, if he did not succeed in selling his goods or decided for any other reason not to export them, the equalization fee was not refunded. The fee, therefore, was not a tax accruing upon application for permission to export and was included in the price at which the goods were offered for sale for export. Under the principle laid down in *Sternfeld* v. *United States, supra,* it is a part of the export value of the merchandise.

It is presumed that the value found by the appraiser is correct and that he found every fact to exist that was necessary to sustain his appraisement. *Transatlantic Shipping Co., Inc (Absorbo Beer Pad Co., Inc.)* v. *United States,* 28 C. C. P. A. (Customs) 19, C. A. D. 118; *E. I. du Pont de Nemours & Co.* v. *United States,* 27 C. C. P. A. (Customs) 146, C. A. D. 75. In the instant case, the appraiser found that on the date of exportation herein such or similar merchandise was being freely offered for sale to all purchasers in the principal markets of Canada in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, at a price which included the amount of the equalization fee being charged on the date of exportation. That price is the export value and it is immaterial that the merchandise may have been offered for sale on a different date at a price which included a different equalization fee. Thus, the complexities of administration suggested in plaintiff's

brief need not arise and there is no evidence in the record to indicate that they would. The presumption of correctness attaching to the appraiser's valuation is not overcome by suppositions that may or may not occur.

On the record herein, I find as facts:

1. That the merchandise involved herein consists of mixed feed oat screenings exported from Canada on or about May 27, 1948.

2. That at the time of exportation of the merchandise involved herein such or similar merchandise was not sold for home consumption in Canada at a price higher than the price for exportation to the United States.

3. That the market value or price at the time of exportation of such merchandise to the United States, at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of Canada, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, included the amount of the equalization fee being charged on the date of exportation, and that such value was the appraised value.

I conclude as a matter of law:

1. That the export value, as that value is defined in section 402 (d) of the Tariff Act of 1930, is the proper basis for determining the value of the merchandise involved herein.

2 That such value is the appraised value.

Judgment will be rendered accordingly.