(Reap. Dec. 10972)

MINKAP OF CALIFORNIA, INC. *v.* UNITED STATES

Entry No. 15538, etc.

(Decided May 4, 1965)

*Lawrence & Tuttle* (*Edward N. Glad* and *Norman Schwartz* of counsel) for the plaintiff.

*John W. Douglas*, Assistant attorney General (*Morris Braverman*, trial attorney), for the defendant.

RICHARDSON, Judge: The merchandise of these appeals consists of ladies' sweaters, exported from Japan during the period between June and December 1957 and entered at Los Angeles, Calif. The sweaters were advanced in value upon appraisement under the cost of production basis of valuation contained in 19 U.S.C.A., section 1402(f) (section 402(f), Tariff Act of 1930). It is claimed by the plaintiff that the sweaters should be appraised, as entered, under the export value basis of valuation, as defined in 19 U.S.C.A., section 1402(d) (section 402(d), Tariff Act of 1930).

The pertinent tariff provisions read as follows:
Section 402(d):

### Export value

The export value of imported merchandise shall be the market value or the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f):

### Cost of production

For the purpose of this subtitle the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

Certain of the facts are not in dispute. The involved sweaters are of Japanese manufacture, having been produced by either of two Japanese concerns. The sweaters were made up in two yarn compositions, namely, a blend of 75 percent lamb's wool and 25 percent silk, and a blend of 80 percent lamb's wool and 20 percent angora. They were also made up in an assortment of styles, identified either by a girl's name or by a number. The silk blend sweaters bore the style names of Alma, Barbara, Clarice, Diane, Ellen, Gina, Honey, Inez, Janice, Kim, Leta, and Margo, and the style number 600; and the angora blend sweaters bore the style numbers 101, 102, 602, 603, 604, and 606. Prices varied according to the sweater style and were quoted in quantities of a dozen sweaters.

What the plaintiff contends here is that, at the times the involved sweaters were exported from Japan, similar sweaters of Japanese manufacture were freely offered for sale in Japan by a third Japanese concern, namely, Tokyo Marusangumi Co., Ltd., to all purchasers for exportation to the United States at the same prices at which the subject sweaters were invoiced and entered. Defendant contends that the evidence fails to establish such offerings of similar merchandise as claimed, by reason of which failure of proof the appraised values must be sustained.

Plaintiff relies upon the case of *Minkap of California, Inc., etc.* v. *United States*, 46 Cust. Ct. 723, Reap. Dec. 10033, *affirmed, United*

*States* v. *Minkap of California, Inc., etc.,* 48 Cust. Ct. 708, A.R.D. 144, the record in which was incorporated in the instant case on plaintiff's motion. In the incorporated case, among other things, one Jiro Wada testified that, between 1947 and 1959, he was the managing director of the firm of Tokyo Marusangumi Co., Ltd., a manufacturer and exporter; that, during 1957, the company did manufacture and export sweaters; that, from 1953 to the end of 1956, his company had an exclusive agreement with A. O. Elliot Import Corp. (American) ; and that, in 1957, following an investigation to determine the big importers in the United States, he came to this country to meet them. Mr. Wada named China Consolidated Corp., J. B. Importers, Products of Asia, Minnesota Knitting Mills, Otto Gerdau, Ames C. Foster Corp., New York Merchandise Corp., and Minkap of California, Inc., as the firms he came here to meet. To these firms and some others, namely, Elliot Import and Arbit Trading, Mr. Wada testified *that, between June and December 1957, Tokyo Marusungumi offered to sell sweaters similar to those at bar in such blends and styles and at such prices as are contended for by plaintiff herein, and that the prices quoted remained constant during that period and did not vary according to quantity.* And one George Gonick, coowner of Minkap of California, Inc., also testified in the incorporated case. He stated *that, during the period from June through December of 1957, he received samples and quotations of prices from Tokyo Marusangumi, as stated by Mr. Wada.*

The foregoing testimony, particularly that of Jiro Wada, constituted the evidence of an export value of similar sweaters which was before the courts in the incorporated case. And it was relied upon by the single judge and the appellate division in that case in finding and sustaining an export value for the merchandise there involved. The single judge said (p. 729) :

In the instant case, testimony was given by Mr. Wada that offers were made at certain prices. This evidence was corroborated, insofar as offers to Minkap were concerned, by Mr. Gonick. It was not contradicted by anything in the record. Mr. Wada at the time had been managing director of Tokyo Marusangumi; he had visited firms in this country to solicit business; he stated positively that he had offered the merchandise to various firms at named prices which did not vary because of quantity.

And of such testimony the appellate division said (p. 712) :

In this case, there is before us the uncontradicted testimony of a qualified witness, who was competent, through experience as managing director of a Japanese manufacturer and exporter, and by personal contact with American importers, to set forth market conditions, as they relate to statutory export value, that control appraisement of the present merchandise. The testimony of the witness, Wada, shows that, during the period in question, he offered sweaters, like those in question, for export to various firms in the United States, at certain prices which did not vary according to the quantity purchased.

The courts found such testimony above noted to be *prima facie evidence* of an export value for similar merchandise.

The record in the case before this court is, in effect, a continuation of and an enlargement upon the record in the incorporated case. The only issue which is litigated in the instant case is the efficacy of Jiro Wada's testimony in the establishment of an export value for the involved sweaters. Thus, in the case at bar, when plaintiff rested its case upon the record in the incorporated case, the Government, apart from other things, recalled for further cross-examination two witnesses who had testified on plaintiff's behalf in the incorporated case.

Jiro Wada was one of the witnesses whom the Government recalled. Mr. Wada stated that, when he testified in the incorporated case to personally making offers of the merchandise involved, he was referring to offers made by his company which were reported to him by other persons. He stated that his testimony then, as to offers made between June and December 1957, was not precise. When his attention was called to the fact that, in the previous case, his testimony with respect to dates was exact, he explained (R. 153–154) :

Well, that is the point that I thought I explained, but as I said before, when I read this over this time I suddenly realized that these questions were questions of certain acts admitted by me during a certain time, certain period of time. Now at that time I thought they were asking me about whether I did that particular act or not. I had not thought that the time element was important. So I had answered, "Did you make an offer?" And then I said, "Yes, I did." But now that I read this over I suddenly realize that this time element is an important factor in there. So my final impression or conclusion, after reading through, was that perhaps I was not cautious enough in trying to get that point straight, and I was hasty in assuming that the question had to do with the act and not of the time element involved in that act.

Mr. Wada stated that his answers now would be different from the answers he gave previously to questions regarding offerings of the merchandise. He testified (R. 154–155) :

A. Yes, my answers would be different.

R. X Q. In what respect, sir?—A. As I have been repeating myself so many times, I keep saying that if you will extend the time, the period of time, duration of time wider then I can say that generally certain acts took place within that time, but if you limit me to from certain month to certain month then I cannot answer with assurance, that is, my recollection then becomes vague, and I cannot make a definite statement.

R. X Q. Well, sir, since the facts in the case relate to shipments made from June of 1957 through December of 1957, am I to understand that you cannot testify with certainty that you offered sweaters of the combinations mentioned before 75 per cent lamb's wool, 25 per cent silk, 80 per cent lamb's wool, 20 per cent Angora, of the styles enumerated in Exhibits 2 through 22, to anybody in the United States during the period of June of 1957 to December '57?—A. Yes, if you are asking me that I should be dead sure that absolutely sure that some-

thing had taken place during a certain period of time, like June to December, and say, "You must be dead sure on this," then I can say no, I cannot be dead sure; I am just telling you that in the general period of time we made offers, and certain things took place. I believe that I am answering all of your questions based on the well, utmost of my conscience and best of my recollection.

R. X Q. You mention the general period of time. What general period of time would you include, Mr. Wada?—A. I think I made that point clear when I was testifying through Rev. Akamatsu, that I wanted sort of a range of time, which starts from somewhere in 1956 and includes 1957, goes into 1958. Now, if you give me all that time then I can say certain things took place.

And, in response to questioning by plaintiff's counsel on redirect examination on the subject of prices, Mr. Wada testified (R. 159) :

R. Q. Did you also state in 1960 as to the offered—did you also give information, or testify as to the offered prices of these sweaters during the period June to December 1957 in the hearing held in September of 1960?—A. Yes.

R. Q. Do you adopt the answers you gave now?—A. No, that is a point that I wanted to say a little while ago, that is, if I had known at that time that the time period of June to December was so important I don't think I would have replied as I did in 1960. I think I would have said, "I am not sure," or "I don't remember." But I tried to accommodate the question, and that is why I answered the way I did.

Mr. Wada also made it clear, in the instant record, on further examinations by both parties that the offerings made to firms other than Minkap of California, Inc., were made under style numbers and names . different from those assigned to Minkap offerings; but Mr. Wada was unable to remember such other style numbers and names. Also, the identities of two of the firms to whom Mr. Wada is said to have made offerings were apparently misstated in the record in the incorporated case. These firms were named in that record as Ames C. Foster Corp. and Arbit Trading. It now appears, in the instant record, that the names of these firms are properly reported as A.M.C. Wholesale Corp. and Eli E. Albert, Inc., respectively.

As part of its case, defendant called six witnesses, all of whom were associated with firms engaged in the business of importing and selling ladies' sweaters of Japanese origin, and all but one of whom were from firms named by Mr. Wada as firms to whom offerings had been made. From these witnesses, the following testimony was elicited.

Lawrence Ginsberg testified that he is vice president and chief buyer for New York Merchandise Co.; that his duties include buying ladies' sweaters from Japan; that he did not conduct any business with Tokyo Marusangumi or Mr. Jiro Wada during the period from June to December 1957; that he had no recollection of receiving any offers from such firm or from Mr. Wada to sell ladies' sweaters in the blends and styles involved herein during that period; and that all sweater offerings would come to his attention.

E. L. Reichard testified that he was manager of the sweater division of Otto Gerdau Co., from 1955 until 1959, and that he never received any sweater offerings from Tokyo Marusangumi or Mr. Wada.

Paul Piatoff testified that he is a buyer for A.M.C. Wholesale Corp., a division of Associated Merchandising Corp. He testified that, to the best of his recollection, he never received any sweater offerings from Tokyo Marusangumi or Mr. Wada during the period in question.

Betsy Peluso testified that she is a buyer for A.M.C. Wholesale Corp. also, and that she is connected with the "upstairs" division. During the period from June to December 1957, she stated that she received no sweater offerings from Tokyo Marusangumi or Mr. Wada.

H. K. Lowe of China Consolidated Corp. testified that he did business with Tokyo Marusangumi and Jiro Wada during the period from June to December 1957, and that he had an oral arrangement with them to purchase ladies' sweaters from them over and above those which were offered to Minkap. He stated that Mr. Wade did not offer the silk blend sweaters to him, and he had no knowledge of such a blend.

Roy Scharf testified that he was a partner in the firm of Leroy Knitted Sportswear, Inc., during the period from June to December 1957; that his firm had an agreement with Minkap, which was in effect at that time, whereby his firm reserved for itself all of Minkap's imported ladies' sweaters; that he never learned that any of these sweaters found their way into the United States by other means; and that, if such had been the case, he most likely would have learned of it. He stated that he met Jiro Wada, but that that meeting took place during his first trip to Japan at the end of 1958, following which Mr. Wada offered him sweaters.

Defendant also offered in evidence an affidavit of one Ted Kuller of Minnesota Knitting Mills, stating through counsel that Mr. Kuller's appearance at the trial could not reasonably be had. Over objection of plaintiff's counsel, decision was reserved as to the admissibility of the affidavit.

In rebuttal, plaintiff offered the testimony of two witnesses, from whom the following testimony was elicited. Herman Gross testified that he is president of Elliot Knitwear Corp.; that he knows the firm of Tokyo Marusangumi and met Jiro Wada in Japan; that his firm had an exclusive arrangement with the firm of Tokyo Marusangumi for the purchase and sale of merchandise (gloves and sweaters) until around the middle '50s; that, during the period between June and December 1957, he was offered sweaters, such as those involved herein, in the blends 75/25 silk and 80/20 angora, by virtue of these blends being automatically included in a variety of blends offered by the

Japanese manufacturer with a sliding scale of prices; that, as to the blend 75/25 silk, he does not recall the specific period of such sweater offerings; and that he selected and purchased from Tokyo Marusangumi sweaters in a 70/30 angora blend. With respect to the prices asked for the particular blends here involved, namely, 75/25 silk and 80/20 angora, Mr. Gross stated that he did not recall the prices at which such offerings were made. He also stated that the offerings were not made to him by the style names and numbers represented in plaintiff's exhibits 2 to 22, but by manufacturer's numbers.

Eli E. Albert testified that, among his other business associations, he is president of Eli E. Albert, Inc., manufacturer and importer from the Orient; that he was in such business in 1957 and knew Jiro Wada both as a friend and as a supplier; that, during 1957, he saw Mr. Wada on several occasions in Mr. Albert's office and in Japan; that, during the period between June and December 1957, sweater offerings were made to him by Tokyo Marusangumi through the mail to his New York office in the blends 75/25 silk and 80/20 angora; that he does not recall whether all of the involved styles were offered to him, but he does recall that about half of the styles depicted in plaintiff's collective exhibits 25 and 26 were offered to him; that he purchased sweaters in approximately eight styles among which were sweaters in the style 604 in the 80/20 angora blend and some in a 75/25 angora blend. As to the prices at which these sweater offerings were made, Mr. Albert stated that the offerings were made at approximately the prices listed in Marusangumi's records, and that, some 7 years later, he was unable to remember prices to the penny or to the dollar.

As the record is now constituted, this court is asked to decide whether an export value has been shown to exist for similar sweaters of the styles and compositions involved herein upon the basis of the testimony. Counsel for the plaintiff argues in their brief (p. 17):

The foregoing testimony taken at the retrial merely strengthens and confirms the facts found by the court in the first decision, A.R.D. 144, *supra*. There can be no doubt that the firm of Marusangumi made *bona fide* offers to all who cared to buy for exportation to the United States of sweaters depicted in exhibits 25 and 26 at the prices stated thereon during the latter half of 1957.

The court disagrees with the argument advanced by plaintiff. A different evidentiary picture confronts this court than that which was before the courts in *Minkap of California, Inc.* v. *United States, supra,* and *United States* v. *Minkap of California, Inc., supra.* In these cases, the witness, Jiro Wada, was sure of his answers to questions propounded to him regarding the sweater offerings, and he responded with positive answers. His testimony was given in a clear and con-

vincing manner and apparently satisfied the courts as to the truth and accuracy of the statements made concerning the offerings.

Quite the opposite is true of the testimony elicited from Mr. Wada in the instant record on the same subject matter. His testimony now is uncertain and indefinite on essential matters, in derogation of the positive assertions he made on the former trial with respect to the sweater offerings. The end result is that this court is left in a quandary by the testimony as to who, in some instances, the principals were on both sides that were involved in the making and receiving of the alleged sweater offerings, the period of time during which the alleged offers were made, and even the prices at which these offerings were made. And, for the first time, this court, after having become acquainted with certain style names and numbers associated with the merchandise at issue and understood to be associated with the Marusangumi sweaters generally, now learns from Mr. Wada's extended testimony that such names and numbers have no relationship to the merchandise purportedly offered to the trade generally, but were confined to identifying the Minkap offerings with whom these names and numbers apparently originated. It is not chiefly with the Minkap offerings with which this court is concerned, but rather with the sweaters offered to the general trade for exportation to the United States; and, yet, the identities of such merchandise style wise must remain nondescript because Mr. Wada does not remember the style identification associated with this merchandise. Small though this facet of the case may seem, it, nevertheless, has a bearing on the overall assessment of the genuineness or lack of genuineness of the alleged offerings. It seems incredible that Mr. Wada can only remember style identification of the sweaters allocated to Minkap.

These are but some of the difficulties plaguing the instant record. They are, however, sufficient to enable and require the court to conclude that the testimony of Jiro Wada is inconclusive and unconvincing on the matter of the sweater offerings. Neither is the testimony of plaintiff's rebuttal witnesses any more enlightening on the subject of Marusangumi's offerings. Mr. Gross' testimony about what is automatically included in the specific offers made to him by Marusangumi borders on speculation. Besides, he had absolutely nothing to contribute concerning prices of these offers which were "automatically included" in the specific, though irrelevant, offers made to him and upon which he acted. In fact, he could remember no prices at all.

As for Mr. Albert's testimony, while he was more positive that some sweaters of the styles and compositions here involved had been offered to him by Marusangumi, still an aura of uncertainty is left at the conclusion of his testimony insofar as prices are concerned. Accord-

ing to Mr. Albert, prices were "approximately" those listed in Maru-sangumi's records. And what the actual prices of these offerings to Mr. Albert were could be anywhere from a "penny" to a "dollar" to use his words, based upon sweater weight. And this, notwithstanding testimony of record indicative of the fact that even Mr. Wada is no longer willing to vouch for the accuracy of prices set out in Maru-sangumi's records. Consequently, it can hardly be said that Mr. Albert's testimony contains convincing language to guide the court in ascertaining the actual prices of the offerings to him.

In the light of the augmented record before this court, not a single offering which was said, in the incorporated case, to have been made, can stand up by virtue of Mr. Wada's testimony or that of other witnesses called by plaintiff to corroborate the testimony of Jiro Wada. And, inasmuch as there is no other evidence in the record to sustain the plaintiff's contention, the court concludes that plaintiff has wholly failed to establish *prima facie* the existence in Japan of *bona fide* offerings of sweaters similar to those at bar in an export market. By reason of this conclusion, it becomes unnecessary for the court to consider the effect of defendant's evidence on the alleged offerings or to rule on the admissibility in evidence of the affidavit of Ted Kuller of Minnesota Knitting Mills (defendant's exhibit C for identification). Unless and until plaintiff makes out a *prima facie* case, defendant has no burden to support the appraised values by competent evidence. 28 U.S.C.A., section 2633; *United States* v. *Spiritos Music School*, 2 Cust. Ct. 801, Reap. Dec. 4490. It is sufficient here to say that nothing contained in defendant's evidence would aid plaintiff in making out a *prima facie* case.

On the basis of the evidence presented, the court finds as facts:

1. That the involved merchandise consists of ladies' sweaters in compositions of either 25 percent silk and 75 percent lamb's wool or 20 percent Angora and 80 percent lamb's wool and in various styles, exported from Japan during the period from June 1957, through December 1957.

2. That the merchandise was appraised on the basis of its cost-of-production value.

3. That, at the times of exportation of the subject merchandise, such or similar merchandise was not freely offered for sale to all purchasers for home consumption in the principal markets of Japan, nor in the principal markets of the United States for domestic consumption.

4. That, at the times of exportation of the subject merchandise, such merchandise was not freely offered for sale to all purchasers in the principal markets of Japan for exportation to the United States.

5. That the evidence fails to establish *prima facie* that, at the times of exportation of the subject merchandise, similar merchandise was freely offered for sale to all purchasers in the principal markets of Japan for exportation to the United States.

The court concludes as matters of law:

1. That the evidence does not overcome the presumption of correctness attaching to the appraised values herein.

2. That cost of production, as that value is defined in 19 U.S.C.A., section 1402(f) (section 402(f), Tariff Act of 1930), is the proper basis for determining the value of the involved merchandise.

3. That such values are the appraised values herein.

Judgment will be entered accordingly.