(A.R.D. 209)

MINKAP OF CALIFORNIA, INC. v. UNITED STATES

Entry No. 15538, etc.

## First Division, Appellate Term

(Decided May 3, 1966)

*Lawrence & Tuttle* (*Edward N. Glad* and *Robert Glenn White* of counsel) for the appellant.

*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the appellee.

Before Oliver and Nichols, Judges, and Wilson, Senior Judge

Nichols, Judge: This is an application for review of a decision and judgment of Richardson, J., reported as *Minkap of California, Inc.* v. *United States*, 54 Cust. Ct. 641, Reap. Dec. 10972.

The merchandise consists of ladies' sweaters exported from Japan during the period between June and December 1957 and entered at the port of Los Angeles. The sweaters were appraised at values greater than the entered values on the basis of cost of production, as that value is defined in section 402(f), Tariff Act of 1930 (now section 402a(f) of said tariff act, as amended by the Customs Simplification Act of 1956). It is claimed that the sweaters should be appraised, as entered, on the basis of export value, as that value is defined in section 402(d), Tariff Act of 1930 (now section 402a(d) of said tariff act, as amended).

It was stipulated at the trial that the sweaters were composed either of 25 percent silk and 75 percent lamb's wool, or 20 percent Angora and 80 percent lamb's wool and that they were in all material respects the same as the sweaters having the same style numbers involved in *Minkap of California, Inc., by Frank P. Dow Co., of L.A.* v. *United States*, 46 Cust. Ct. 723, Reap. Dec. 10033, affirmed *sub nom. United States* v. *Minkap of California, Inc., by Frank P. Dow Co., Inc., of L.A.*, 48 Cust. Ct. 708, A.R.D. 144. The record in that case was incorporated herein.

The merchandise in the incorporated case was obtained from three sources of supply: Takii & Co., Minomo Seni K. K., and Tokyo Marusangumi Co., Ltd. The merchandise supplied by the first two was appraised on the basis of cost of production and that supplied by the third on the basis of export value.[1] It was stipulated that no foreign value existed for such or similar merchandise during the period. Plaintiff claimed that the merchandise procured from the first two suppliers was similar to that supplied by Marusangumi and was duti-

---

[1] R59/14153, style No. 602.

able on the basis of export value. The trial court sustained the claim, stating (p. 729) :

In the instant case, testimony was given by Mr. Wada that offers were made at certain prices. This evidence was corroborated, insofar as offers to Minkap were concerned, by Mr. Gonick. It was not contradicted by anything in the record. Mr. Wada at the time had been managing director of Tokyo Marusangumi; he had visited firms in this country to solicit business; he stated positively that he had offered the merchandise to various firms at named prices which did not vary because of quantity.

On review, this division also sustained the claim. *United States* v. *Minkap of California, Inc., by Frank P. Dow Co., Inc., of L.A., supra.* The court stated (pp. 712–713) :

In this case, there is before us the uncontradicted testimony of a qualified witness, who was competent, through experience as managing director of a Japanese manufacturer and exporter, and by personal contact with American importers, to set forth market conditions, as they relate to statutory export value, that control appraisement of the present merchandise. The testimony of the witness, Wada, shows that, during the period in question, he offered sweaters, like those in question, for export to various firms in the United States, at certain prices which did not vary according to the quantity purchased. Corroboration thereof is found in the testimony of a partner of Minkap who stated, with reference to all of the various styles in question, that "We received offers and samples on all the sizes."

At the trial of the instant case, further testimony was taken and the court held that plaintiff had failed to make out a *prima facie* case. *Minkap of California, Inc.* v. *United States, supra.* The court stated that a different evidentiary picture confronted the court from that in the previous cases, in that the witness then was sure of his answers, gave his testimony in a clear and convincing manner, and satisfied the court as to the truth and accuracy of his statements concerning the offerings, but that his later testimony was uncertain and indefinite on essential matters and in derogation of the positive statements he had made. The court said:

* * * The end result is that this court is left in a quandry by the testimony as to who, in some instances, the principals were on both sides that were involved in the making and receiving of the alleged sweater offerings, the period of time during which the alleged offers were made, and even the prices at which these offerings were made * * *

The court also noted that, instead of the style names and numbers being associated with the Marusangumi sweaters generally, they were confined to the Minkap offerings and that Mr. Wada did not remember the style identification of the other offerings. It also found that the

testimony of plaintiff's rebuttal witnesses was insufficient to establish offerings or prices to others than Minkap.

The resolution of the issue before us requires an examination of both records in order to determine the extent to which the testimony in the first case has been changed, weakened, or repudiated, and whether the facts established now would support a finding of export value.

According to the record, Minkap at and before the period involved herein purchased sweaters from various suppliers in Japan. Its method of doing business was for the designs of sweaters to be drawn, samples made and given to the supplier for counter samples, and the supplier's offer submitted as to price. When Minkap's customer approved, orders were sent to Japan. The styles involved herein were designated by women's names (Alma, Barbara, etc.) or numbers, and sweaters in those styles and the yarn compositions mentioned were sold to Leroy Knitted Sportswear, Inc., the sole customer for ladies' sweaters. Minkap did not sell these styles to anyone else, but the manufacturers were said to be free to sell to others.

Before the period involved herein, Marusangumi had had an exclusive arrangement with Elliot Knitwear Corp., which had terminated about the end of 1956. This arrangement was made by a "gentlemen's agreement" and not a (written) "contract" and was understood by Mr. Wada to apply only as long as the importer continued to buy. At the termination of this arrangement, Mr. Wada made an investigation to find who were the biggest importers in this country; he (or his firm) sent them letters, and in January 1957, he came over to meet them. He listed a number of firms which he said he approached, but at the second hearing he stated that he personally did not meet representatives of all of those firms and he declined to pinpoint dates, stating that he had been here on several occasions and could not recall exactly when he met certain importers. Other testimony corroborates his statements that he visited the United States in 1957 and that he met representatives of some of the firms mentioned.

As a result of Mr. Wada's activities, Minkap approached Marusangumi when it needed additional supplies in 1957, sent samples, and received counter samples and offers. Quotations were made and received at the prices stated by Mr. Wada. No purchases were made except for style No. 602 in the Angora and wool blend and No. 600 in the silk and wool blend.

At the original hearing, there were received in evidence exhibits 25 and 26 which Mr. Wada testified his staff made up according to the specifications received from Minkap. Each is made up of sheets, with holes on the left margins, apparently from a ledger, with a name or style number at the top, a drawing of a particular style sweater, measurements for various sizes, a notation of the yarn composition,

samples of buttons, and a price. The drawings and measurements are done by pen and ink. The yarn compositions are in lead pencil. Prices are shown in yen and dollars. Some of the yen figures are in pen and ink. Other yen figures and most of the dollar figures are in pencil. The yen and dollar figures do not reflect a uniform currency conversion rate. The sheet for style 600 has a pen and ink notation reading: "June 1, 1957. Old price $33.99. Revised price $32.35." It seems a reasonable inference that these sheets were not all prepared at the same time; it is reasonable to infer that they were used in Marusangumi's offices in preparing quotations for Minkap. They offer no internal evidence of having any relation to transactions with anyone except Minkap. At the second hearing, Mr. Wada stated that those records showed his firm's selling prices during 1957 for those sweaters, and that they were the prices at which anyone could purchase who cared to buy for exportation to the United States.

According to Mr. Wada, there was no exclusive arrangement with Minkap prohibiting him from offering the same styles to others, and he made offers to all Marusangumi's customers at the Minkap prices. A number of such customers was listed. At the second hearing, Mr. Wada admitted that he did not make all the offers personally; some were made by his staff and reported to him. Some of the offers were oral and some in writing; some were made in Japan and some in the United States. Different style names and numbers were used in making these offers, the names, Alma, etc., being used to Minkap alone.

Of the other witnesses who testified, Herman Gross, president of Elliot Knitwear Corp., stated that he had purchased sweaters from Marusangumi during the period June to December 1957 and that he had been offered sweaters in the blends here involved by Mr. Wada both in Japan and in New York from November 1956 through 1957. He had requested a sample of a sweater in the silk and wool blend but he was not seriously interested in it. The merchandise was not offered by the names Alma, Barbara, etc., but by manufacturer's numbers, and he did not recall the prices.

Mr. Eli E. Albert testified that his firm purchased sweaters from Marusangumi during 1957 and that, from June to December 1957, Mr. Wada had offered sweaters in the silk and wool, and Angora and wool, blends. He did not buy any of the former but did buy some sweaters in the Angora blend. Although he stated that Mr. Wada came to his office frequently, he said that the offers were made to him through the mail. He did not produce any copies of the offers but stated that the Alma sweater was offered at the prices listed in "this" book; that he bought the Alma style in a different blend but it was offered in the silk and wool blend at "the prices listed on these sheets." Counsel for the plaintiff interprets this testimony as referring to exhibits 25 and 26 and, in the absence of other "sheets," we assume it does.

Mr. Lowe of China Consolidated Corp., testified that he had made a verbal agreement with Mr. Wada for exclusive purchasing rights for the west coast with the exception of Minkap but had never been offered sweaters in the silk and wool blend nor any styles in women's names. He admitted he might possibly have been offered those styles in later years.

Witnesses from other firms to which Mr. Wada testified that he or his firm had offered sweaters in the styles and blends here involved stated that they had no recollection of such offers, although normally such offers would come to their attention.

In the instant case, in order to prevail, plaintiff is required to establish prices at the time of exportation at which sweaters in the styles and yarn composition here involved were freely offered by Marusangumi to all purchasers in the principal markets of Japan in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States.

It is clear, and all parties concede, that Mr. Wada is the key witness. If his testimony does not convince, plaintiff's case must fail. The trial judge said that, in the second trial, Mr. Wada recanted the testimony he had given in the earlier one. (This word "recants" is in the headnote, which by our practice, the court prepares, and which sums up findings and holdings in the text.) It is important to avoid unfairness to an honorable gentleman, a Japanese national and resident, not fluent in English, who appears to have been doing his best to assist the court. The record shows he did not think the interpreter very good at either Japanese or English at the first trial. He read his testimony at the first trial, as transcribed, before he took the stand in the second. Then he pointed out, without evasion or equivocation, that he had found important errors. At the very outset, he volunteered that he had "appeared on behalf of the company, rather than as an individual," at the former trial. One supposes he intended to mean that at the former trial he did not distinguish between his knowledge and that of his company, or between what he did and what other officers or agents of his company did. This ought to have been apparent because at the former trial he repeatedly said "we" when "I" would have been more responsive. It may also mean that his company had an interest in the outcome of the litigation. At any rate, it seems the statement of a man who had been honestly confused about what was required of him in testimony at a trial in a (to him) foreign country. The most striking change not accounted for, thus, is with respect to the period during which he made offers, extended, at the second trial, to 1956–1958, inclusive.

There were conflicts of testimony between Mr. Wada and Mr. Wada, and between Mr. Wada and other witnesses. Judge Richardson had

the opportunity, which we lack, to observe the demeanor of Mr. Wada and of other witnesses. His evaluation of the oral testimony he heard rests in part on considerations not fully reviewable from the cold record. He stated that he was required "to conclude that the testimony of Jiro Wada is inclusive and unconvincing in the matter of the sweater offerings." The testimony of plaintiff's rebuttal witnesses was not more enlightening. This made it unnecessary, he held, to evaluate the testimony of defendant's three witnesses, taken before the late Judge Johnson in Los Angeles.

It is clearly established that, between 1956 and 1958, Mr. Wada and other agents of his company offered to some persons other than Minkap, sweaters such as or similar to the ones at bar, or some of them, both in Tokyo and in New York, for export to the United States. What is not established is whether the offers were uniform, or to whom, and at what prices and terms they were made. There is a total lack of documentary evidence such as we would naturally look for. Mr. Wada used pricelists for other merchandise—examples are in the record— and if he did not use them for the offers here alleged, the most obvious explanation is that he was attempting to make contracts by negotiation only. If he did use them, the failure to produce them is not explained. The "business records," so-called, collective exhibits 25 and 26, are fully described above. If, as the evidence showed, at the second trial, the names and numbers, Alma, etc., 101, etc., were not used in offers other than to Minkap, neither could exhibits 25 and 26 have been so used, either as originals or in reproduction. The two exhibits are business records relating to transactions with Minkap, not anyone else. Yet the unhappy Mr. Wada is made to say about these exhibits in the first trial record (IR 79):

Quoting my business records, we offered Alma, 25 per cent silk, 75 per cent lamb's wool, our price was $37.53 f.o.b.

in a course of questioning that related to offers to his "various customers" (IR 76–77, the phrase appears twice). What he meant we shall never know, but the then trial court must have understood him as stating that exhibits 25 and 26 showed that he freely offered Alma to parties other than Minkap at the figure indicated, and so through Barbara, Clarice, and the others. If Mr. Wada or his company's agents were freely offering such sweaters, they surely must have put something on paper in their own files and in the hands of potential buyers to show what they were offering. It is hardly credible that, if it existed, no such paper has survived and been made available for the court's inspection.

Businessmen, members of organizations, do not go about the world scattering offers broadcast, without making any record of what they are doing. In the absence of such documentary corroboration, the

oral evidence would have to be clear and convincing, which is far from being the case here. The trial court in the present case believed, and we think wholly reasonably, that alleged undocumented and oral offers needed to be brought into focus, showing the court who was talking to whom, where and when, what was said, and above all, exactly what was offered. Here we are left in confusion whether Mr. Wada or someone else made the offers, whether in Tokyo or the United States, when, to whom, and how the offerors conveyed to the offerees a description of what they were offering. Mr. Albert says he received offers by mail at his New York office, but the letters are not offered and no explanation of their absence is forthcoming; this leaves his testimony more upsetting than helpful. Mr. Wada claimed he made his offers in the course of personal visits, making no reference to any offers by mail, and his offers to Albert were in the course of transactions with Albert's agent in Japan. He said:

When I made an offer it was usually our offer, *or* some descriptive material.

This would seem to mean the so-called offers in some instances may have been mere furnishing of descriptive material. In the case of China Consolidated Corp. and Minnesota Knitting Mills, he could not remember which styles he offered. Later he said offers were oral in some cases, written in others, and he could not specify which offers were which. When he visited customers, he showed them his samples and they showed him their samples.

We exchanged designs. Well, in general, I was trying to open up a market for my products.

It seems more probable that his visits and those of his company's agents were exploratory to get negotiations started, rather than to make offers which could be accepted or rejected. It is reasonable to suppose he expected other United States customers to do as Minkap had done, supplying drawings and specifications on which he was to furnish quotations, delivery dates, etc. Samples of the Minkap designs, if he displayed them, were to show what he could do. He was not selling merchandise already in stock or in production, nor remnants, but sought orders to keep his plant in production at full capacity. At any rate, what we have, to prove the alleged free offers herein, consists of (a) a complete absence of relevant documents, exhibits 25 and 26 not being records bearing on the transactions involved, and some other writings that would have been relevant, mentioned in the testimony but not produced, and (b) oral conversations between unspecified persons, at unspecified times and places, at which unspecified things were said. In this view, it makes little difference whether the alleged offers were made at times from 1956 to 1958, or within any shorter span of

time. If offers were made, plaintiff ought to be able to tell us what terms of payment were proposed, and what delivery schedules. Offers would be incomplete without these items, especially offers from Japan.

The period of exportation involved herein is from June through December 1957 and, at the original trial, Mr. Wada stated positively that sweaters in these styles and yarn compositions were being freely offered during that time. At the second hearing, he was unwilling to relate the offers to that period precisely but said the offerings were made at some time between the middle of 1956 and the middle of 1958. He explained:

* * * After I read this record over this time, that is, 3 years after I had made these statements, I began to realize that many of the questions were predicated on many different elements. For instance, questions which deal with time, the place, the circumstances under which a certain thing is being questioned as to whether it is true or not; and at that time, three years ago, my English was even poorer than it is now. I merely understood the question part, that is, I did not understand that it had to be a question was confined to a certain period of time. I didn't realize that. I thought I was just being asked a question, and I answered them. I remember that the interpreter who was assigned to me at that time was an old Japanese man, a native of Japan, who did not speak English too well, and whose Japanese was not too well. So I don't think the mistakes that I made in here were exclusively the question of pronunciation, but in many cases I don't think that I understood the question too well. But I did my best to answer those questions.

As to "time of exportation," it has been held that the period is not limited to the hour or day of exportation but, depending on the circumstances of the case, may include a period before or after the dates of exportation of the imported merchandise. *United States* v. *New York Merchandise Co., Inc.*, 31 CCPA 213, C.A.D. 274; *United States* v. *Fisher Scientific Co.*, 44 CCPA 122, C.A.D. 648; *Atlas Trading Co.* v. *United States*, 26 Cust. Ct. 652, Reap. Dec. 7989.

In *United States* v. *New York Merchandise Co., Inc.*, *supra*, which involved United States value, the court said (p. 218):

* * * Second, the phrase "at the time of exportation" does not necessarily mean the hour or the day of exportation, but a time near enough to the date of exportation and under such circumstances as will reflect the price of the goods on the date of exportation. It is obvious that no definite period prior or subsequent to the exportation can be fixed as a standard for all cases. A fluctuating market, which might be brought about by many reasons, might make a date of sale or offer in this country prior or subsequent to the date of exportation an improper one to accept in determining the question here involved. On the other hand, the proof might show a steady, unvarying market or other conditions which would make a date months removed from the date of exportation a proper one to reflect what the price was on the date of exportation.

In *Atlas Trading Co.* v. *United States, supra,* which involved export value, the court stated (p. 660) :

The trial judge apparently held that since plaintiff's exhibit 1 related to prices on and prior to January 16, 1940, the date when the goods were shipped from Tientsin, and not the date of exportation of the rugs, February 16, 1940, plaintiff had therefore failed to prove export value. Plaintiff has cited *United States* v. *New York Merchandise Co., Inc.,* 31 CCPA (Customs) 213, C.A.D. 274; *United States* v. *Reiner,* 35 CCPA (Customs) 50, C.A.D. 370, which hold that it is not necessary that a freely offered price be shown on the exact date of exportation of the goods. There is nothing in the record to indicate a fluctuating price or unstable price conditions; but, on the contrary, the stability of the price established by plaintiff's exhibit 1 is confirmed by the testimony of the witness Silverman (Tr. 57–59) and also by defendant's collective exhibit 3, dated April 5, 1940, which refers to hooked rugs, and the invoice unit prices or values of 26 and 14 cents mentioned therein coincide with unit prices in the instant case; and we may infer that the freely offered prices of January 16, 1940, had not changed up to April 5, 1940, and therefore were the same on February 16, 1940.

In the instant case, the period mentioned by Mr. Wada might be considered sufficiently close to the dates of exportation provided it were shown that there was a stable market and that prices did not vary. Plaintiff attempted to show this latter and was hampered by the exclusion of questions.

The record as it is, is not clear. There is doubt that any market for these blends and styles existed for any considerable period of time. Mr. Gonick, who requested the samples and offers in the first place, testified at the original hearing :

A. The listing of the styles that you just enumerated are made in a composition of 25 per cent silk and 75 per cent lamb's wool. At the time when offers were requested of the Marusan Company for this group, not only were the 25 per cent silk and 75 per cent lamb's wool requested, but the 20 per cent Angora and the 80 per cent lamb's wool— at that period the inclination and the demand of the market was limited in terms of the Angora, and at that period where they were changing the demand of requirements, consequently from that period on, if my memory serves me correctly, we no longer purchased any more the 25 per cent silk and 75 per cent lamb's wool, but our business was conducted in 20 per cent Angora and 80 per cent lamb's wool, and we no longer purchased, and it was foolish to continue to take these or to purchase in a yarn blend that was not desirable and not marketable.

Mr. Lowe stated that the styles here involved were novelties and would not sell for more than one season.

The revision of Mr. Wada's testimony, as to when he made his alleged offers, brings into play this testimony as to the short selling life such or similar merchandise might be expected to have. On the whole,

we believe the plaintiff is not prejudiced or aggrieved by not being allowed to show that offered prices remained stable over a longer period than June-December 1957. Supposing this were true, however, the confusion and uncertainty respecting aspects of the alleged offers other than time would be fatal to the appeal herein. In our view of the case, it makes no difference whether Mr. Wada made his alleged offers at the alleged prices between June and December, inclusive, 1957, or between 1956 and 1958, both inclusive.

Therefore, the appraised values must be sustained.

We affirm the findings of fact and conclusions of law of the trial judge, which we incorporate by reference.

The decision and judgment below are affirmed. Judgment will be rendered accordingly.